SOUTHWESTERN GAS & ELECTRIC COMPANY V. H. F. STANLEY.

No. 6185.   Decided March 14, 1934.
(70 S. W., 2d Series, 413.)

*George Prendergast,* of Marshall, and *Bartlett & Harvey,* of Linden, for plaintiff in error.

It is the duty of plaintiff to minimize his damages when the same can be done by the expenditure of a reasonable small amount of money or labor. Montrief v. Bragg, 2 S. W. (2d) 276; Texas & P. R. R. Co. v. James, 82 Texas, 306; Field on Damages, p. 131; Texas & St. Louis R. R. Co. v. Young, 60 Texas, 201.

Exemplary damages cannot be recovered in suit based on breach of contract. Cumberland Tel. Co. v. Hendon, 114 Ky., 501, 71 S. W., 435; Hooks v. Fitzenrieter, 76 Texas, 277, 13 S. W., 230; Southwestern Tel. & Tel. Co. v. Luckett, 60 Texas Civ. App., 117, 127 S. W., 856; Brooks v. Long, 199 S. W., 510.

*Carney & Carney,* of Atlanta, for defendant in error.

The cause of action was one sounding in tort and not purely a breach of the terms of a contract. Western Union Tel. Co. v. Hice, 288 S. W., 175; Gulf, C. & S. F. Ry. Co. v. Levy, 59 Texas, 542.

The pleadings and the proof were sufficient to sustain a finding and judgment for exemplary damages. Weyer v. Wegner, 58 Texas, 539; Chronister Lbr. Co. v. Williams, 116 Texas, 207, 288 S. W., 402; Simpson v. Lee, 34 S. W., 1053.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

Stanley recovered a judgment for actual and exemplary damages against the plaintiff in error, which upon appeal was affirmed by the Court of Civil Appeals. (45 S. W. (2d) 671). The statement of the case in the opinion of the Court of Civil Appeals is quite full, and we deem an elaborate statement here unnecessary. Stanley, with his family, resided in Queen City, Texas. His residence was wired and equipped for the use of electricity, used by him for ordinary household purposes, including lights and refrigeration, and for pumping water from his well. He also owned a business enterprise consisting of a filling station, garage, and grist mill, a few blocks from his residence, which was also equipped for the use of electricity. The Southwestern Gas & Electric Company was a public service corporation, with a plant in the neighboring town of Atlanta, from which it also supplied the town of Queen City with electric current. The Company supplied Stanley with electricity at both his residence and business plant above described, but did so under separate contracts, and by different lines and through separate meters. The residence had been supplied with electricity several years before he had the current cut into his place of business. There was never any controversy between the parties as to the residence contract, or the payment of the bills relative thereto, prior to the act of the plaintiff in error which gave rise to this suit. However, some time prior to December, 1930, a controversy arose between the parties as to the correctness of the account and charges made with respect to the garage or business plant, which continued until in December, 1930, when the Company cut off the electricity because the account had not been paid in accordance with its contentions. It is unnecessary to quote the evidence with reference to this account. The statement made by the Court of Civil Appeals shows that Stanley had failed to pay that account solely because he thought the meter installed by the Company was working inaccurately and the account excessive. A reading of the statement of facts convinces us that Stanley had reasonable grounds for his contention, and was acting in good faith. In fact, a finding by the jury that the meter was either out of order or worthless would have been amply justified.

However, while the difference over the garage account was still unadjusted, the Company cut the electricity off from the garage or shop without first having its account reduced to judgment, or its accuracy determined by agreement.

■ If there is a contention made in good faith and upon apparently reasonable grounds by a customer that there has been an overcharge by a public service company, such as the plaintiff in error, service to the customer may not be shut off in advance of a judicial determination of the correctness of its contention. Withers v. Fort Worth Gas Co., 238 S. W., 324; Thornton on Oil & Gas (4th ed.), Vol. 1, sec. 633, p. 1320; Sickles v. Manhattan Gaslight Co., 66 How. Prac., 314; Wood v. Auburn, 87 Me., 287, 29 L. R. A., 376.

The suit before us, however, is not based on the act of the Company in cutting off the current from Stanley's shop. We mention it here as showing the initial wrong by the Company which finally culminated in the acts made the basis of this case.

Finally, on February 26, 1931, the Company, because Stanley had not paid the *garage or shop account,* cut the electricity off from his *residence, although the amount due on the residence account was tendered.* The Company declined to turn the current back, and left the residence without electricity until the District Court by mandatory injunction forced the Company to reconnect the residence with its line. This suit followed the act of the plaintiff in error in cutting off its current from Stanley's residence, and the jury awarded both actual and exemplary damages.

No complaint is here made as to the award of actual damages. The contention before us is that the award of exemplary damages was unjustified. We do not agree with that contention.

We again refer to the opinion of the Court of Civil Appeals for a statement of the facts of the case. Mr. Ramsey, the manager of the Company, testified that he cut off the electricity from Stanley's residence solely because the shop account had not been paid. In part he testified:

"I did not inquire about Mr. Stanley. Mr. Stanley came to see me in December. Yes, the bill was there and solely for his shop. There was a different meter for the shop from the house. Yes, they were carried separately. He paid his house bill for August, September, October, November and December. Yes, he paid them in full. Yes. I told him in February that unless he paid his shop bill I would have his house cut off. I knew those were two different bills. He did not beg me not to do it.

You ask me if he did not say 'Here's the money for my house, do not cut it off.' He wasn't pleading with me, and he did not beg me. Yes, he tendered to me the money for his house one time in the office, and I refused to take it. I cut him off anyway. You (Judge Carney) called me the night his lights were cut off. His lights were cut off about four o'clock in the afternoon. You say you called me about seven o'clock and told me the man had a Frigidaire and other stuff and begged me to put him back on. I don't know that I begged you. I don't know that you asked me to. Yes, you asked me by what authority I cut him off. I told you I had the authority to cut them off. Yes, I cut the man off at his house because he would (not) pay his shop bill. I did not know he had a Frigidaire until after the current was cut off. I knew he was using electricity for ordinary home purposes. Yes, I knew people had Frigidaires and etc. in their homes. I also knew that he could not get electricity from any other source. I did not put him back on until I had to. Yes, the Court made me do it. You say that I would not agree to do it when the sheriff told me to. That was my ignorance of the law in that. I do not know that the sheriff threatened to take me to jail, but he suggested that it might be a good idea to put them back on.

\* \* \* \* \* \* \* \* \* \* \*

"Yes, those items that I have mentioned for merchandise shows that Mr. Stanley, in addition to paying big shop and house bills, paid the company over $50.00 for merchandise. He was not necessarily the best customer we had, but he was a good one. Yes, when I cut him off all those things, the lights at his house had been paid for. I cut off his house to force him to pay the bill at the shop. I knew nothing about Mr. Stanley's financial standing. I did not make an effort to find that out, and I have not made any since. You say that I figured that I would deliberately force him to pay a bill that he said was unjust by cutting off his house. I had to have a settlement. \* \* \* It is a rule of the Company to cut off the lights if the bills are not paid."

It will be noticed that Mr. Ramsey candidly states the exact motive of the Company in cutting off its service from Stanley's residence, when he says:

*"I cut off his house to force him to pay the bill at the shop."*

In view of the undisputed facts, we are in full accord with the opinion of the Court of Civil Appeals that exemplary damages were recoverable. When a public service company turns off or disconnects its service to coerce the payment of an un-

authorized demand, the consumer may recover punitive damages where the circumstances justify it. McQuillin on Municipal Corporations (2d ed.), Vol. 4, sec. 1919, p. 1023; Birmingham Water Works Co. v. Keiley, 2 Ala. App., 629, 56 So., 838; Carmichael v. Southern Bell Tel. & Tel. Co., 157 N. C., 21, 72 S. E., 619, 39 L. R. A. (N. S.) 651, 654.

■ It is true that in the instant case Stanley was indebted to the Company on the shop account; but the shop service, as we have seen, had been theretofore discontinued by the Company, without, as we believe, authority of law, had Stanley protested. And the failure of Stanley to pay the amount demanded for that past service, under a different contract, and for a different purpose, could not be lawfully used as an excuse for denying Stanley service at his residence under another and different contract. Texas Central Power Co. v. Perez, 291 S. W., 622; 16 Texas Jurisprudence, p. 236, sec. 7.

■ The motive which actuated the Company in cutting its current from Stanley's residence was to *force* him to pay an account due under another contract, the accuracy of which was in dispute. The action of the Company, under all the circumstances, was clearly unwarranted in law, and oppressive in its effect. Its oppressive character was well understood by the Company, for its manager said that its purpose was to *force* Stanley to pay the disputed bill. The Company when it acted thoroughly understood that the cut-off would deny Stanley the use of electricity at his residence, for the reason that it was the only source of electric supply in the little town where Stanley resided. To say the least of it, the conduct of the Company was tortious and oppressive. Under such circumstances, as shown by the Court of Civil Appeals, exemplary damages are recoverable, even where the tortious conduct involves a breach of contract. Authorities supra: 13 Texas Jurisprudence, p. 247, sec. 137; Scheps v. Giles, 222 S. W., 348; 8 Ruling Case Law, p. 590, sec. 134; 17 Corpus Juris, p. 983, sec. 280.

■ In the instant case, however, something more was involved than a mere breach of contract. The plaintiff in error was a public service company, and its duty to supply Stanley with electricity arose not only from its contract, but also from its public duty as well. 16 Texas Jurisprudence, p. 230, sec. 3; 21 Texas Jurisprudence, p. 8, sec. 6. Its tortious conduct arose not only from its refusal to comply with its contract with Stanley for an oppressive purpose, but also from its refusal to fulfill its public duty from a like purpose.

There is no merit in the contention that the Company was not responsible in exemplary damages for the conduct of its manager. The question was not raised in the trial court, nor in the brief filed in the Court of Civil Appeals. The Court of Civil Appeals, therefore, was not called upon to pass upon the question of fact as to whether or not the evidence showed that the Company's manager, Ramsey, was such an agent or officer of the corporation as that it could be held liable in exemplary damages for his oppressive conduct; and the question is therefore not before us. However, the undisputed evidence shows that Ramsey was the corporation's manager at Atlanta, Texas, and that Queen City, where Stanley resided, and Bloomburg were within his jurisdiction. He stated:

*"I stand in the place of the Company in my dealings with the public in that section."*

He also said he had authority to cut off Stanley's residence current because the shop account had not been paid; *"that it was a rule of the Company to cut off the lights if the bills are not paid."*

In addition to the foregoing, the plaintiff in error in its answer admitted that it cut off the electricity from Stanley's residence because he had not paid the shop bill; and declared it had the right to do so. It is plain that Ramsey, the manager, was the *alter ego* of the Company; and the Company is responsible for his conduct. Fort Worth Elevators Co. v. Russell, 123 Texas, 128, 70 S. W. (2d) 397, and authorities therein cited.

The judgment of the Court of Civil Appeals is affirmed.